# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:15-CR-42-TLS |
| | ) | |
| SHAIKI SUTTON | ) | |

## OPINION AND ORDER

During the investigation of an attempted bank robbery that occurred on June 17, 2015, investigators came to believe that another robbery attempt, on a different institution, was imminent. Investigators obtained a search warrant that authorized placement of a tracking device on a white 2006 Pontiac as one of the vehicles they suspected would be used to facilitate the robbery. Defendant Shaiki Sutton had a property interest in the white Pontiac, and has filed a Motion to Suppress on grounds that the warrant should not have been issued because the Search Warrant Affidavit did not provide a substantial basis for a probable cause determination. For the reasons set forth in this Opinion and Order, the Court is unpersuaded by the Defendant's arguments and denies his Motion to Suppress.

## PROCEDURAL BACKGROUND

The five co-Defendants in this case, Sutton, Freddie L. Church, Jr., Tyler M. McCarthy, Christian Smith, and Autumn J. Carter, have been charged with conspiracy

to affect commerce by robbery under the Hobbs Act, 18 U.S.C. § 1951(a) and (b) (Count

1); attempted robbery under the Hobbs Act, 18 U.S.C. § 1951(a) and (b) (Count 3);

attempted entry into a credit union with the intent to commit armed bank robbery, 18

U.S.C. § 2113(a) and (d) (Count 4); and, carrying a firearm during and in relation to a

crime of violence, 18 U.S.C. § 924(c) (Count 5) [Indictment, ECF No. 36]. Two of the

Defendants, McCarthy and Smith, are also charged with a separate attempt to commit

armed bank robbery, 18 U.S.C. § 2113(a) and (d) (Count 2).

On August 25, 2016, Defendant Sutton filed a Motion to Suppress Evidence [ECF

No. 116]. The Defendant asked that the Court suppress "all evidence seized by the

Government as a result of the Government's use of a Global Positioning Device (GPS)."

Because the police obtained a search warrant permitting them to attach the GPS unit to

his vehicle, the Defendant's Motion turned on the sufficiency of Search Warrant

Affidavit that the issuing judge relied upon to authorize the placement of the GPS

tracking device. The Defendant's Motion also left open the possibility that the Affidavit

disclosed false or misleading material in violation of *Franks v. Delaware*, 438 U.S. 154

(1978).

In response, the Government asserted that the Defendant had to first establish

standing to challenge the warrant and that, in any event, the warrant was properly

issued upon sufficient probable cause. The Government also noted that, after the

tracking device was installed on the white Pontiac, the movements of that vehicle were

nonetheless witnessed by physical surveillance, both on the ground and in the air.

Therefore, the traffic stop that led to the discovery of the evidence that the Defendant

sought to suppress resulted from the independent observations of the officers, i.e. an

independent source, and not from the tracking information. The Government stated

that an evidentiary hearing would be necessary to resolve the standing issue and,

possibly, the independent source issue.

On October 21 and 27, 2016, the Court conducted evidentiary hearings. The

parties' post-hearing briefs have narrowed the issues for consideration. Based on the

testimony provided during the evidentiary hearings, the Government is no longer

contesting the Defendant's standing to challenge the attachment of the GPS unit to the

white Pontiac. The Defendant's Supplemental Brief [ECF No. 221] and Reply Brief [ECF

No. 239], are chiefly concerned with whether the Search Warrant Affidavit provided

sufficient grounds to authorize placement of the GPS device on his car. However, the

Defendant also presents argument that extends beyond the four corners of the

Affidavit, arguing that the Affidavit should have included information about the

informant's criminal history.

**FACTUAL BACKGROUND**

On July 2, 2015, Darrin Strayer, a Detective with the Fort Wayne Police

Department (FWPD), submitted a Search Warrant Affidavit to an Allen Superior Court

judge. The judge granted the Warrant, which authorized the placement of GPS tracking

devices on two vehicles for thirty days. One was a 2006 white Pontiac and the other a

2007 red Chrysler.

**A.      Contents of the Search Warrant Affidavit**

According to Detective Strayer's Affidavit, he believed that the two vehicles

"have been and will be utilized as primary modes of transportation in connection with a

criminal enterprise involved in the robberies of banks and credit unions." (Aff. 1, Ex. 2

to Suppression Hr'g.) He stated that use of a GPS tracking unit on these vehicles would

facilitate the identification of individuals associated with the criminal enterprise. (*Id.* 3.)

In support of his belief, Detective Strayer provided background about an

attempted robbery of the Fire/Police Credit Union located on Inwood Drive in Fort

Wayne on June 17, 2015, by two masked individuals. Three days after the attempted

robbery, a "cooperating individual" told FWPD Detective Scott Criswell that he had

information about two local bank robberies. On June 22, 2015, a member of the FBI

Robbery Task Force, Roy Stuckey, met with the cooperating individual, who identified

Christian Smith, Tyler McCarthy, and Jordan Stroud, who he believed to be the brother

of Autumn Carter, as the individuals who had attempted the robbery on June 17.

However, Stroud had become scared and did not enter the Credit Union. This same

day, the cooperating source had a conversation with Smith, during which Smith

admitted that he and McCarthy were responsible for the attempted robbery of the

Fire/Police Credit Union on June 17. This conversation was recorded, and Detective

Strayer advised in the Affidavit that he had listened to the recording, which

corroborated the cooperating individual's statements.

On July 1, the cooperating source relayed to Detective Strayer that Smith told the

source that day that he was planning a bank robbery in Waterloo, Indiana. Additionally,

McCarthy and others referred to as the "Ashley Crew" were planning to rob a bank

within thirty miles of Fort Wayne, somewhere close to an interstate highway. Detective

Strayer stated that a bank robbery had occurred in Ashley, Indiana, on June 15, 2015.

The cooperating source asked Detective Strayer for a vehicle so he and Smith "could

observe in Waterloo." (Aff. 2.) Detective Strayer provided a vehicle to the cooperating

source. The vehicle contained a tracking device.

On July 2, law enforcement used the tracking device on the provided vehicle and

visual surveillance to confirm that the cooperating source used the vehicle to meet up

with Smith. They drove together to apartments at a Bridgeway Circle address in Fort

5

Wayne. Smith entered the apartment and, when he returned to the vehicle, Smith and the cooperating source drove to Waterloo. They drove around an area close to the Farmer's State Bank, then returned to the Bridgeway Circle address. Smith, McCarthy, and the cooperating source then went to a McDonald's before returning to the same apartments. The cooperating source reported that Smith went inside the apartment the first time to give McCarthy a gun for a bank robbery planned for that day. He stated that, the second time, Smith entered the apartment and returned wearing different clothing, which visual surveillance confirmed. According to the source, Smith told him while they were at McDonald's that Smith, McCarthy, and the Ashley Crew were going to rob a bank in the next hour. When the cooperating source dropped Smith and McCarthy back at the apartment, Smith said he would call the source to pick him up after the robbery.

At around noon, Smith, McCarthy, and two male blacks believed to be Church and Sutton, left the apartment and entered the 2006 white Pontiac. A minute later, a black female identified as Autumn Carter left the apartment and got inside a 2007 red Chrysler. Officers in unmarked vehicles followed the two vehicles. The vehicles first stopped at a gas station, then continued on Interstate 69 South to the 264 exit in Grant County. Carter, in the red Chrysler, stopped at a gas station on Highway 18 across the street from the Via Credit Union. She positioned the vehicle to have a view of the credit

union. The driver of the Pontiac drove around the credit union four times without entering its parking lot. Twenty-nine minutes later, the two vehicles left the area. They returned to the apartments on Bridgeway Circle.

The cooperating source called Detective Strayer to tell him that Smith still planned on robbing the Waterloo bank the next day, July 3, 2015.

**B.     Police Surveillance on July 2 and July 3, 2015**

Detective Roy Stucky, and others, testified concerning details that investigators observed during surveillance of the Co-defendants' movements on July 2. This information was not a part of the Search Warrant Affidavit. According to this testimony when the four males left the apartments and got in the white Pontiac, they were wearing dark clothing. During one of the passes the car made past the Via Credit Union, the driver stopped so that paper could be placed over the license plate. This method had been used in previous bank robberies to obscure any witness's view of the license plate. During the nearly thirty minutes that the white car drove around the credit union, the red car remained parked at the gas station. The driver never pumped gas, went into the store, or even exited the car. Both cars then traveled back to the apartments in Fort Wayne.

The GPS tracking units were installed during the early morning hours of July 3.

Concerned that bank robberies were imminent—either in Waterloo, Marion, or both—law enforcement took precautionary measures. Officers and surveillance units were located in the Waterloo area and had consulted with the bank's management. In Marion, the Via Credit Union did not open for business. The employees parked their cars as usual, but they were not at the credit union.

At 5:30 AM on July 3, officers began conducting surveillance outside the apartment. Around 8:00 AM, one of the individuals left the apartment and wiped down the door handles and doors of the white Pontiac. Officers believed this was intended to remove finger prints. A short time later, the same four males from the previous day, again dressed in dark clothing, loaded into the Pontiac. The female got into the red Chrysler. Several unmarked law enforcement vehicles were used to keep a visual on the cars as they headed to Marion. Additionally, an FBI airplane was used to conduct air surveillance.

The cars used the same route they had the previous day to get to Marion. The red car parked in the same location at the gas station. Investigators believed the driver of the red car was acting as a look out or as a diversion or switch car, if necessary. The case agent testified about the white car's movements for first twenty-five to thirty minutes after exiting the highway:

> The white car goes up and down the county roads as it did previously, made several passes by the bank. It stopped in driveways, and did several U-turns

at one point. It stopped in the—the airplane surveillance believed that they were covering the plate up as they did the previous day.

They made a couple more passes by the bank. At one point, they slowed in front of the bank and almost had come to a stop, and I remember at which time we thought that maybe they were going to pull in the bank at that time in an attempt to rob it.

(Tr. 94.) Around 10:00 AM, the airplane surveillance saw the white Pontiac pull into the credit union parking lot. The car parked at about a forty-five degree angle just in front of the entrance doors. The driver, front seat passenger, and rear driver-side passengers immediately exited the vehicle and ran to the credit union door. The other rear passenger was slow to exit. After pulling on the locked door, they all turned and ran back into the car. "[T]hey were in such a hurry to leave that the individual exiting the passenger-side rear still had a leg hanging out and just got his leg back in as the vehicle was rapidly in reverse." (Tr. 97.) As the car exited the parking lot, it pulled onto the county highway without stopping. The police units that had been in place around the credit union stopped the car. Another traffic stop was conducted on the red Chrysler that was parked at the gas station.

## ANALYSIS

A.    **GPS Tracking Device and Search Warrant**

The installation of a GPS tracking device on a vehicle, and "use of that device to

monitor the vehicle's movements" is a "search" within the meaning of the Fourth

Amendment. *United States v. Jones*, 565 U.S. 400, 404 (2012). As such, a search warrant,

establishing probable cause, is required. "If an affidavit is the only evidence presented

to the judge in support of a search warrant," as it was here, "the validity of the warrant

depends on the strength of the affidavit." *United States v. Carson*, 582 F.3d 827, 831–32

(7th Cir. 2009) (citing *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003)).

The "central teaching of [Supreme Court] decisions bearing on the probable

cause standard is that it is a 'practical, nontechnical conception.'" *Illinois v. Gates*, 462

U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in

particular factual contexts—not readily, or even usefully, reduced to a neat set of legal

rules." *Id.* at 232. "Probable cause is established when, based on the totality of the

circumstances, the affidavit sets forth sufficient evidence to induce a reasonably

prudent person to believe that a search will uncover evidence of a crime." *Peck*, 317 F.3d

at 756. For this reason,

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238. "A magistrate's determination of probable cause should be paid

great deference by reviewing courts." *Id.* at 236 (quotation marks omitted). "[T]he duty

of a reviewing court is simply to ensure that the magistrate had a substantial basis for

concluding that probable cause existed." *Id.* at 238–39 (citation, quotation marks,

brackets, and ellipsis omitted).

The Defendant emphasizes that there is nothing in the Affidavit to suggest that

the 2006 Pontiac, or the Defendant, had been involved in a previous robbery. The

Affidavit's first mention of the Pontiac is when Smith, McCarthy, and two other black

males got into the Pontiac and drove to Grant County on July 2, 2015. Additionally, the

Affidavit never conclusively identifies Sutton as one of the occupants. These arguments

are non-starters.

There was no requirement that law enforcement positively know the identities of

all the occupants of the vehicle. The totality of the information provided to the judge

was sufficient for her to make a practical, common-sense decision that there was a fair

probability that monitoring the movement of *the vehicle* would provide evidence that a

bank robbery was being planned or attempted. Particularly in light of the individuals

who had been positively identified as being in the car—Smith and McCarthy. The

cooperating source stated that Smith and McCarthy, along with the Ashley Crew,

intended to rob a bank thirty minutes from Fort Wayne, off of an interstate highway.

Smith had already been heard during a recorded conversation admitting to a previous

robbery. Smith and McCarthy, along with two other males, then proceeded to drive

thirty minutes away from Fort Wayne and engage in activity entirely consistent with

deciding whether to rob a bank. The circumstances of the trip to Marion by the five

individuals in the two vehicles was sufficiently suspicious to induce a reasonably

prudent person to believe that they intended to engage in illegal conduct, particularly to

rob a financial institution. Even if the Defendant had not been involved in previous

robberies as part of the Ashley Crew, it was reasonable to believe that he was in the

planning stages to participate in a future robbery. It was also fair to believe that the

white Pontiac would be used in any such attempt, having just been used that day as the

means of transportation to bring the four men to Marion under circumstances that

would seem suspicious to any reasonably prudent person. Considering the totality of

circumstances, the judge had a substantial basis to conclude that tracking the white

Pontiac would reveal evidence related to an attempted bank robbery.


**B.      Matters Outside the Four Corners of the Affidavit**

"[T]he law allows a challenge of affidavits on the ground that material facts were

omitted and that the omission was made intentionally or with reckless disregard for the

truth." *United States v. Sims*, 551 F.3d 640, 645 (7th Cir. 2008) (first citing *United States v.*

*Williams*, 737 F.2d 594, 604 (7th Cir. 1984); then citing *United States v. McNeese*, 901 F.2d

585, 594 (7th Cir. 1990)); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The Defendant argues that Detective Strayer omitted material and substantial information about the cooperating source's criminal history. Particularly, the Defendant believes that the source's 2012 conviction for false informing and his 2013 and 2014 convictions for shoplifting should have been included in the Affidavit.

The Court finds that the omission cannot be said to arise to the level of negligence, much less intentional or reckless disregard for the truth. The Affidavit, assessed as a whole, *Carson*, 582 F.3d at 832, contained sufficient details to establish the credibility of the source's statements on material matters, and to establish probable cause. While the informant's credibility may have been of critical importance during the initial stages of the investigation, independent police work quickly became the focus. The Affidavit described the extensive efforts by police to corroborate that the informant's statements were accurate. *See Carson*, 582 F.3d at 832 (noting that the extent to which police have corroborated an informant's information is a factor courts consider when reviewing adequacy of affidavit) (citing *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002)). Another factor is the "the degree to which the informant has acquired knowledge of the events through firsthand observation." *Id.* Here, the source actually drove Smith to Waterloo (which investigators observed), and had conversations with him regarding a previous bank robbery attempt and an upcoming robbery.

Additionally, the details in the Affidavit, derived from both the informant's statements and from police surveillance, suggested that the Pontiac was going to be used to commit another robbery within a matter of days, not some nebulous future date. Moreover, "a magistrate in the exercise of sound judgment is entitled to give greater weight to a tip from a known informant, who can be held responsible should he be found to have given misleading information to police officers, and thus has an incentive to provide truthful information to the detectives." *Koerth*, 312 F.3d at 871.

This Court's review of the Affidavit reveals that the issuing judge had a substantial basis for concluding that probable cause existed to issue the warrant, and the omission of the informant's arrests does not detract from this finding.

## C.       Independent Source and Exclusionary Rule

Even if the GPS unit had been attached to the Defendant's vehicle without a warrant, nothing in the record suggests that any data from the GPS device was used to obtain evidence that will be used against the Defendant. The independent source doctrine is intended to avoid putting police in a worse position than they would have been by allowing the admission of evidence obtained by independent legal means. *United States v. Gonzalez*, 555 F.3d 579, 581 (7th Cir. 2009). The Court finds that the holding in *United States v. Martin*, 712 F.3d 1080 (7th Cir. 2013), is instructive. In *Martin*,

the court rejected an argument for suppression where data from an improperly attached

GPS only "aided law enforcement officials in tracking down" the defendant for arrest.

*Id.* at 1082. The court distinguished the case from situations where "the GPS data was

used to establish a necessary link between the defendant" and his criminal activity. *Id.*

The GPS unit was not installed on the Defendant's car until July 3. Thus,

investigators were not assisted by the GPS unit on July 2, but relied solely on physical

surveillance. (Tr. 69.) Although several officers had the capability of monitoring the GPS

units from their cars on July 3, the GPS units were intended to be a secondary measure

to the ground and air surveillance that occurred on July 3. This surveillance maintained

constant watch on the white Pontiac, and thus there was no need to use the GPS data.

As the Government notes, there was no mention at the evidentiary hearing of this data

facilitating the investigation. Thus, there is no indication that the search, by way of the

GPS tracker on the white Pontiac, had any bearing on the decisions to stop the vehicle

on July 3, 2015, after it left the Via Credit Union, and to seize the car's occupants.

Accordingly, even if the GPS tracker had been illegally installed, there would be no

basis to exclude from trial the evidence officers obtained as a result of the stop and

search of the vehicle.

## CONCLUSION

For the reasons stated above, the Court DENIES the Defendant's Motion to

Suppress Evidence [ECF No. 116].

SO ORDERED on May 16, 2017.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
